IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO. 8:25-cv-00022-TPB-TGW

MARK MURPHY AND MARIA
MURPHY, as guardians of OLIVIA
MURPHY, BERNITA GIGOWSKI as
guardian of SARAH MELISSA
GIGOWSKI, DEBORAH HOLLAND as
guardian of SEAN HOLLAND, LUANNE
SELLS, as guardian of TYLER RAYMOND
SELLS, SUZANNE PREVATT
TRUEBLOOD, as guardian of AUSTIN
JAMES TRUEBLOOD, and all other persons
similarly situated,

      Plaintiffs,

v.

VILLAGES AT NOAH'S LANDING LTD.,
a Florida Limited Partnership, NOAH'S
ARK OF CENTRAL FLORIDA, INC. d/b/a
ROAR FLORIDA, a Florida Not-For-Profit
Corporation, ATALA CONSULTING, LLC,
a Florida Limited Liability Company,
ROYAL AMERICAN MANAGEMENT,
INC. a Florida Profit Corporation, and
CONSTANCE BAMBERG, an individual.

      Defendants.

_____/

## **FIRST AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR A JURY TRIAL**

**COME NOW**, the Plaintiffs, MARK MURPHY AND MARIA MURPHY,

as guardians of OLIVIA MURPHY, BERNITA GIGOWSKI as guardian of SARAH

MELISSA GIGOWSKI, DEBORAH HOLLAND as guardian of SEAN HOLLAND, LUANNE SELLS, as guardian of TYLER RAYMOND SELLS, and SUZANNE PREVATT TRUEBLOOD, as guardian of AUSTIN JAMES TRUEBLOOD, and on behalf of all others similarly situated, by and through their undersigned counsel, and sue Defendants, CONSTANCE BAMBERG, VILLAGES AT NOAH'S LANDING LTD., NOAH'S ARK OF CENTRAL FLORIDA, INC. d/b/a ROAR FLORIDA, ATALA CONSULTING, LLC, and ROYAL AMERICAN MANAGEMENT, INC., INC. for causes of action, and in support thereof state as follows:

### Introduction

1.    One of the most difficult issues parents of adults with developmental or intellectual disabilities face is what will happen to their child when the parents are no longer available to provide care and supervision. When this question was asked from the 1940s to the 1980s, the answer would be an institution that promised that they were caring and thoughtful to the person with a disability. In the best of institutions, the person would be segregated and warehoused; in the worst of institutions, like Pinehurst or Sunland, the adults would suffer horrible abuse.

2.    For the next 30 years, laws such as the Americans with Disabilities Act of 1990, and the Fair Housing Amendments Act of 1988, and cases such as Olmstead v. L.C., 527 U.S. 581 (1999), required the creation of a web of laws, regulations and

protections that would prevent the creation of institution-like facilities that segregate and isolate persons with disabilities. Community-based options were developed. For those who could live independently, support was provided. For those who need more assistance, group homes were funded. However, the question remains, "what will happen to my child when I die?"

3.    With the promise of independent living, adequate supports, and socialization opportunities in a safe environment, developers of affordable housing facilities decided that large facilities that only house persons with intellectual and developmental disabilities would be a viable option.

4.    The Villages at Noah's Landing sold Plaintiffs on this dream, and now these adults with developmental disabilities are paying large sums of money to a facility that victimizes their loved ones.

## JURSIDICTION AND VENUE

5.    This Court has original jurisdiction over the action pursuant to 28 U.S.C. § 1331, and 28 U.S.C. 1343 for the Plaintiffs' claims arising under The Fair Housing Amendments Act of 1988 (hereinafter "FHA"), and supplemental jurisdiction under 28 U.S.C. § 1367 for the state law claims.

6.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2) because (a) the Defendants regularly conduct business is in

this judicial district, and (b) a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred and are occurring within this judicial district.

## PARTIES

7.    The Villages of Noah's Landing (hereinafter "The Villages") is a residential community for adults with intellectual and developmental disabilities located in Lakeland, Florida.

8.    Plaintiffs, MARK MURPHY AND MARIA MURPHY, are guardians of OLIVIA MURPHY, a woman with a developmental disability who resides at the Villages of Noah's Landing. Olivia Murphy has been living at Noah's Landing since 2019.

9.    Plaintiff, BERNITA GIGOWSKI is the guardian of SARAH MELISSA GIGOWSKI, a woman with a developmental disability who resides at the Villages of Noah's Landing. Sarah Gigowski has been living at Noah's Landing since July 2016.

10.    Plaintiff, DEBORAH HOLLAND is the guardian of SEAN HOLLAND, a man with a developmental disability who resides at the Villages of Noah's Landing. Sean Holland has been living at Noah's Landing since July 2016.

11.    Plaintiff, LUANNE SELLS, is the guardian of TYLER RAYMOND SELLS, a man with a developmental disability who resides at the Villages of Noah's Landing. Tyler Sells has been living at Noah's Landing since May of 2019

12.    Plaintiff, SUZANNE PREVATT TRUEBLOOD is the guardian of AUSTIN JAMES TRUEBLOOD, a man with a developmental disability who resides at the Villages of Noah's Landing. Austin Trueblood has been living at Noah's Landing since 2016.

13.    Defendant NOAH'S ARK OF CENTRAL FLORIDA, INC. d/b/a ROAR (hereinafter "ROAR") is a Florida not-for-profit corporation headquartered and doing business in Polk County, Florida. ROAR is the primary operator with Royal American Management, Inc. at the Villages at Noah's Landing.

14.    Defendant CONSTANCE BAMBERG is the president of ROAR, resides in Polk County, Florida and is *sui juris*.

15.    Defendant VILLAGES AT NOAH'S LANDING LTD. is a Limited Partnership licensed and doing business in Polk County, Florida. Defendant VILLAGES AT NOAH'S LANDING LTD.  (hereinafter "Noah's Landing") is the developer and owner of the Villages at Noah's Landing property. The General partner of this entity with .01 percent ownership is THE VILLAGES AT NOAH'S LANDING MEMBERS LLC, of which Defendant ROAR is the sole officer. The limited partner with 99.99 percent of the ownership is Regions Bank, who purchased the tax credits as part of the financing for the project.

16.    Defendant ROYAL AMERICAN MANAGEMENT, INC., (hereinafter "RAM") is a Florida corporation licensed and doing business in Polk County, Florida.

17.    Defendant ATALA CONSULTING, LLC, is a Florida Limited Liability Company licensed and doing business in Polk County, Florida. Atala Consulting and its employees work in conjunction with NOAH'S ARK OF CENTRAL FLORIDA, INC. in the operation of the Villages at Noah's Landing.

18.    Each of the defendants, through their officers, agents and employees were substantially involved in the operation of the Villages, including promulgation, enforcement and maintenance of the discriminatory practices and rules which form the basis of claims asserted herein.

## STATEMENT OF FACTS

19.    In mid-1996, ROAR established group home facilities for persons with developmental disabilities in Lakeland, Florida, named  Noah's Nest. Pursuant to 393.063(18)  Fla. Stat. the capacity of such a facility shall be at least four (4) but not more than fifteen (15) residents.

20.    Starting in 1997, Noah's Nest experienced significant growth and development, and ROAR and its officers and employees focused on advocacy and support for adults with developmental disabilities. In 1997, ROAR began its journey with community engagement and support activities, with the intention and dream of

building a community development dedicated to community of persons with developmental and intellectual disabilities.

21.    In 2004, ROAR acquired fifty-six acres of property for the development of The Villages at Noah's Landing with the help of local government and community leaders. However, due to the limitations of Florida law for congregate homes for persons with disabilities, ROAR could not develop the Villages into a large facility for solely persons with intellectual or developmental disabilities.

22.    In 2009, ROAR intensified its legislative advocacy efforts, working to include more individuals with disabilities in community activities and support systems. It formed a coalition of organizations and parents of children with disabilities who aimed at expanding the use of congregate facilities for persons with developmental disabilities and lobbied for amendments to the Florida statutes to allow construction on their found parcel in Lakeland.

23.    The coalition jointly advocated a legislative bill which would amend 419.001, Fla. Stat., to allow a "Planned Residential Community." House Bill 371/Senate Bill 1124, would have allowed communities *solely* occupied by persons with developmental disabilities:

d) "Planned residential community" means a community established for persons with developmental disabilities, as defined in s. 393.063, that may be a planned unit development with amenities designed to serve the needs of such residents consisting of two or more community residential homes which may be contiguous to one another.

The Senate Staff analysis contained a section describing the requirements of the Fair Housing Act and the legacy of <u>Olmstead v. L.C. ex rel. Zimring</u>, 527 U.S. 581, 119 S. Ct. 2176, 144 L. Ed. 2d 540 (1999), with regards to housing for persons with disabilities and the limitations imposed by the law. This bill died in committee.

24.    In 2010, the coalition jointly advocated an almost identical bill which would amend 419.001, Fla. Stat., to allow a "Planned Residential Community." However, this bill was passed with an amendment ***requiring*** integration with individuals without developmental disabilities:

> (d) "Planned residential community" means a local government-approved, planned unit development that is under unified control, is planned and developed as a whole, has a minimum gross lot area of 8 acres, and has amenities that are designed to serve residents with a developmental disability as defined in s. 393.063 **but that shall also provide housing options for other individuals**. The community shall provide choices with regard to housing arrangements, support providers, and activities. The residents' freedom of movement within and outside the community may not be restricted. For the purposes of this paragraph, local government approval must be based on criteria that include, but are not limited to, compliance with appropriate land use, zoning, and building codes. A planned residential community may contain two or more community residential homes that are contiguous to one another. A planned residential community may not be located within a 10–mile radius of any other planned residential community.

This bill passed and was codified at 419.001, Fla. Stat.

25.    At no point has the Florida Legislature pass any law which permitted any housing provider to impose a quota, express or implied, on any covered class

under civil rights laws, such as race, color, national origin, religion, sex, familial status, or disability.

26.    Notwithstanding failed legislative efforts to obtain the legislative authority to develop a community that solely consisted of persons with intellectual disabilities, ROAR business model was built on the ability to obtain public tax credit funding to subsidize construction and operation of their facility through the Low-Income Housing Tax Credit (LIHTC) program.

27.    Florida Housing Finance Corporation (FHFC), is the state-created organization established to make decisions about where and how to allocate such LIHTC and other funding for affordable housing opportunities for Florida residents.

28.    The LIHTC program was established by the Tax Reform Act of 1986. The program was adopted to encourage private investment in much needed affordable rental housing, for which it is the largest source of federal assistance.

29.    The Federal Internal Revenue Service provides the general regulatory framework governing administration of the LIHTC program. FHFC and their agents are charged with LIHTC allocation and most program oversight.

30.    LIHTC are federal income tax credits that may be claimed for a ten-year period, beginning with either the taxable year in which a building is placed in service or, at the election of the taxpayer, the succeeding taxable year.

31.   In 2013, advocates for all supportive housing obtained ten (10) million dollars of funding from the Florida Legislature to the FHFC to fund a competitive grant program for private non-profit organizations to build or renovate housing designed, constructed, and targeted for persons with developmental disabilities.

32.   In evaluating proposals for these funds, the FHFC was required to consider how residents would receive employment opportunities and support that would be available to residents of the proposed housing and a plan for residents to effectively and efficiently access community-based services, resources, and amenities.

33.   After significant lobbying, Florida FHFC issued a request for applications for financing to build Larger Permanent Supportive Housing Properties to provide access to funding for large supportive living projects for persons with developmental and intellectual disabilities.

34.   FHFC defines permanent supportive living as follows:

Rental housing that is affordable to the focus households with household incomes at or below 60 percent of area median income (AMI), that is leased to the focus households, for continued occupancy with an indefinite length of stay as long as the Permanent Supportive Housing tenant complies with lease requirements. Permanent Supportive Housing shall facilitate and promote activities of daily living, access to community-based services and amenities, and inclusion in the general community. Permanent Supportive Housing shall strive to meet the needs and preferences of the focus households.

35.    In 2013, Noah's Landing applied for funding for the Larger Permanent Supportive Housing for Persons with Developmental Disabilities.

36.    ROAR applied to FHFC for such funds by preparing and submitting a detailed application. After receiving these applications, FHFC evaluates and scores developers' applications, awarding LIHTC loans and grants to applicants who provide units for low-income individuals.

37.    ROAR obtained assistance in applying for funding and planning future operation from ROYAL AMERICAN MANAGEMENT, INC. (hereinafter "RAM"). RAM offers full-scope management services for all types of conventional and affordable multifamily and single-family housing rental communities. Thus, in addition to possessing a sophisticated understanding of affordable housing programs, it is involved in all aspects of Low Income Housing Tax Credit ("LIHTC") Compliance, budgeting and cost management as well as contracting with tenants and engaging in property management. RAM was retained to operate the Villages at Noah's Landing and was hired due to its experience in managing residential communities of persons with intellectual and developmental disabilities.

38.    This extremely competitive funding application provided additional points for required resident services to be provided by applicants, which points would determine who would be a funding recipient.

39.     Such services included in the applicant's submission would be the responsibility of the applicant but may be submitted in conjunction with public and/or private partnerships as approved by the FHFC. If the applicant was chosen for funding by FHFC, the services must be available at no cost to the residents and available for their voluntary participation.

40.     The Village at Noah's Landing's application was approved. Regions Bank provided funding in exchange for tax credits and provided other financing. The VILLAGES AT NOAH'S LANDING LTD was created to develop the property. ROAR as the sole officer of "THE VILLAGES AT NOAH'S LANDING MEMBERS LLC, became its general partner with a .01 percentage share, and Regions Bank was the limited partner with 99.99 percentage share.

41.     Noah's Landing received over $ 14,920,000 dollars in tax credit funding, grants and loans, as follows:

a.  $ 1,500,000 Grant Funding: This is a non-repayable financial award provided by the Florida Housing Finance Corporation (FHFC). The grant was intended to support the construction and permanent financing of the development. It does not accrue interest and does not need to be repaid, making it a crucial source of funding for the project.

b.  $1,320,000 State Apartment Incentive Loan (SAIL) from Florida Housing Finance Corp.: The SAIL program provides low-interest loans

to developers for the construction or rehabilitation of affordable rental housing. The loan for Noah's Landing has a term of 30 years and a 0% interest rate. It is non-amortizing, meaning no regular payments are required, and it is typically repaid at the end of the loan term or upon sale of the property.

c. $1,000,000 Extremely Low Income (ELI) Loan from Florida Housing Finance Corp.: This loan is designed to support housing for extremely low-income households. The ELI loan for Noah's Landing has a term of 50 years and a 0% interest rate. Like the SAIL loan, it is non-amortizing, and the principal is forgivable at maturity, provided the units remain targeted to ELI households for the duration of the compliance period.

d. Low-Income Housing Tax Credit (LIHTC) Allocation: 1,100,000 annually and 11,000,00 in total for the ten-year period. This is an annual allocation of federal tax credits to attract private investment into the project. These credits were sold to Regions Bank to raise equity for the project and to reduce their federal tax liability.

42.    In exchange for this financing, VILLAGES AT NOAH'S LANDING LTD entered into an Extended Low-Income Housing Agreement and a separate Land Use Restriction Agreement (LURA) with FHFC  that ran with the land as a

restrictive covenant, as well as loan documents with several lenders that required the developer and operator to conform to very specific requirements relating to the construction, occupancy limitations, and amenities provided at The Villages.

43.    Once the tax credit financing and loans have been calculated and awarded, FHFC is responsible for monitoring compliance, and Noah's Landing is required to comply with a host of ongoing reporting requirements through its agents, ROAR and RAM. Though tax credits are claimable for a period of ten years. a portion may be recaptured if the project does not comply for a term of fifteen years.

44.    The Villages at Noah's Landing was to consist of 52 Duplex/Garden/Single-Family (rental) units located in sixteen residential buildings, which includes eight one bedroom, six two bedroom and 112 individual room occupancy units.

45.    The Villages at Noah's Landing was to be constructed in accordance with applicable law, including accessibility requirements and green building and energy efficiency features. In addition to those requirements required by law, Noah's Landing was to include Twenty Five percent of its units which were fully compliant with the new construction requirements of the Americans with Disabilities Act to ensure that the units are accessible to those who use wheelchairs, and ten percent of the total units are required to be accessible for those with hearing or visual impairments.

46.    The demographics of the development were required to be limited to those that were low income or extremely low income according to Area Median Income amounts set per locality by the Department of Housing and Urban Development. At least 80% of the units are for households with incomes at or below 60% of the Area Median Income (AMI), with 25% of the units set aside for tenants with incomes at or below 40% of the AMI.

47.    As a development earmarked by FHFC for persons with developmental disabilities, at least 80% of the units were set aside for persons with developmental disabilities. The remaining 20% of the units can be occupied by other low-income households that meet the income eligibility criteria but do not necessarily have developmental disabilities. The two units set aside for full-time management and/or maintenance employees are not included in this designation.

48.    In addition, the Land Use Restrictive Agreement (LURA) and the financing documents required the provision of permanent **supportive** housing for persons with developmental disabilities. This includes not only housing but also the provision of various supportive services to help residents live independently and thrive in their community, with the specified and required services provided to the residents without charge:

   a. **Services Coordination**: Assisting residents with accessing and maintaining community-based services. This includes helping residents

become aware of and access appropriate services and resources. The Villages were required to assist interested residents with the coordination of their community-based services. The purpose is to assist each resident to become aware of, access and/or maintain adequate and appropriate community-based services and resources.

b. **Manager On-Site 24 Hours Per Day**: Management personnel must always be available on the premises to receive and address resident calls.

c. **Additional Resident Services and Best Practices**:

    i. At least one private office space per fifty persons with developmental disabilities for services like individual counseling, case management, legal consultation, and assessments.

    ii. Community vans and public bus transportation.

    iii. On-site and off-site employment options.

    iv. Job development and placement services.

    v. Employment support services provided at job placement and follow-up at 90 and 180 days.

    vi. Coordination of services through oversight, monitoring, and performance measures.

      vii.  College-based transition programs with local colleges and universities to support residents in pursuing higher education and vocational training.

    viii.  Resident advisor available to provide additional support and guidance to residents.

      ix.  Social Engagement: Organizing community-based events to foster social interaction, community building, and engagement among residents. Property management and resident community-based services coordination should not be the same staff; the functions were required to be separate.

49.    Many of these activities were to occur within the common facilities of the developed property, including, but not limited to the clubhouse, den, game room, porches, pool area, and other areas, all of which were developed with this funding.

50.    There is a desperate need for affordable housing for persons with intellectual or developmental disabilities, as many members of this minority population are supported though fixed income though Supplemental Security Income (SSI) and supports are provided by Medicaid and the Medicaid Waiver. [1]

---

[1] Medicaid waivers," more formally known as Home and Community-Based Services (HCBS) waivers, are a form of assistance where a person with seven different types of disabilities, including intellectual or developmental disabilities are provided support services to ensure that persons with disabilities are not placed in institutions and have

51.    For these apartments, the FHFC sets income limits and rent limits for occupancy. The maximum gross rent[2] permitted is approximately thirty percent of the maximum income limit per person, which is either 40% or 60% of the region's AMI. However, currently, the average income for the tenants of the Villages at Noah's Landing is approximately fifteen percent of AMI. As such, even the deeply subsidized rent is higher than the resident's income. HUD guidance states that the rent burden on a person should be approximately thirty percent of their income.

52.    Income qualification standards that RAM establishes for its market rate properties is that the tenant must have income that is three times the amount of rent charged. For Affordable Housing, RAM requires tenants to have income that is twice the rent charged. For this property, there were no requirements for a minimum income.

53.    The concept of a Supportive Living development for persons with developmental disabilities was created with the intention that a person with a

---

the right to live in the community.  This State of Florida funding covers a wide range of services that are widely used by these adults, including personal care assistance, dental care, home health services, life coaching and behavioral health services.  Each recipient is assigned a support coordinator to help develop a support plan to have these services. Medicaid waivers are a highly sought after benefit and there is currently a waiting list for these waivers that is over 20,000 persons long.

[2] Pursuant to the ELI Agreement - Gross rents mean "any amount paid by a tenant in connection with the occupancy of a Residential Rental Unit, plus the cost of any services that are required to be paid by a tenant as a condition for occupancy, plus the cost of any utilities, other than telephone, cable television or internet, for such unit." Any amounts that are part of or derived from the eligible basis of the property are included in the gross rent.

disability could reside in a development and be provided community-based socialization and services while being able to afford such housing on SSI and being provided services though the Medicaid Waiver.

54.    Any housing facility that houses more than fifteen residents is deemed to be presumptively institutional by the Centers for Medicare & Medicaid Services and may not receive Med waiver services at the facility unless the facility demonstrates that it does not have institutional qualities and how the setting promotes community integration and individual choice.

55.    Large-scale developments occupied solely by persons with developmental or intellectual disabilities are deemed presumptively institutional because they do not provide community-based services, supports, and enrichment activities that are commonly provided within an integrated environment. Because of the lack of resources at large-scale facilities, these facilities devolve into a facility in which persons with disabilities are isolated from the community and suffer from the lack of care and resources.

56.    In responding to the inquiry related to rebutting the presumption of an institution, Noah's Landing made representations to Florida Medicaid they do not provide **any** support services. The representation made to Florida Medicaid was "[w]e are simply landlords providing affordable housing." Noah's Landing

represented that it does not provide any support services, direct or indirect, such as personal care, daily living support, transportation, training, and more.

57.    Noah's Landing made the representation that "[u]nlike institutions that provide comprehensive care and support services on-site, the Villages at Noah's Landing requires residents to seek external support and medical services, reinforcing the independent living model." Additionally, according to Noah's Landing, residents that wish to seek competitive employment will be referred to Vocational Rehab or the Agency for Persons with Disabilities to obtain a job coach.

58.    Based on these representations to the State of Florida, the Villages at Noah's Landing was permitted to have residents that receive the Medicaid Waiver.

**Lease up and Residency at the Villages at Noah's Landing**

59.    The Villages at Noah's Landing opened in 2016 with fanfare and the promise that it would provide persons with intellectual disabilities and developmental disabilities a "forever home" that would satisfy the living needs and provide the needed assistance when their parents were no longer alive. The expectation is that the resident's family would not need to subsidize their child and be able to feel confident that their child will be happy and well cared for.

60.    From 2016 to 2022, ROAR and RAM operated the Villages, including advertising, leasing, evaluating tenant eligibility and enforcing the rules for the Villages. In 2022, Defendant Constance Bamberg became president/CEO of RAM

and brought in Defendant ATALA to assist RAM and ROAR to operate the Villages, and all four entities jointly operated all aspects of the property. When Constance Bamberg became President/CEO, she personally enforced or oversaw the enforcement of the operations of Noah's Landing and its rules. These entities are referred to collectively as "Noah's Landing Staff."

61.    The Noah's Landing Staff published and continues to publish and advertise the Villages of Noah's Landing as a development solely for persons with intellectual or developmental disabilities - "The Villages at Noah's Landing is a dynamic residential community for adults with intellectual and developmental disabilities."

62.    To apply and be eligible to be a resident of the Villages, the Noah's Landing Staff publishes and enforces the following requirements:

a.  Residents must have low income or extremely low income.

b.  Residents must have a documented intellectual or developmental disability. This includes conditions such as autism, Down syndrome, and cerebral palsy.

c.  Residents must provide Noah's Landing an Assessment of Needs that is completed by a third-party professional that clearly defines the type and intensity of support services required by the individual.

d.  Families must be able to demonstrate how the support needs of the future resident will be provided (i.e., Med-Waiver services, CDC+, private pay (special-needs trust, or other family support). Parents' income is not considered, only a resident's income, assumed by a minimum of the current SSI rate plus any employment income.

e.  All residents must be on the Medicaid Waiver, or a Consumer Directed Care plan. For those who are not currently on Med Waiver or CDC+ and qualify must apply for services and provide documentation of placement on the waitlist or receipt of denial.

63.  Noah's Landing Staff took it upon themselves to become involved in understanding, in depth, the nature and extent of a resident's disability.

64.  At the inception of tenancy, and every year thereafter, Noah's Landing Staff publishes that they evaluate each resident for independent living through a comprehensive skills assessment process. This includes:

a.  **Life/Home Skills**: Assessing the ability to manage daily household tasks.

b.  **Self-Care**: Evaluating personal hygiene and self-care routines

c.  **Mobility**: Checking a resident's ability to move around independently.

d.  **Functional Skills**: Assessing practical skills needed for daily living.

e.  **Health & Safety**: Ensuring residents can maintain their health and safety.

f.  **Behavioral Assessment**: Evaluating behavior and social interactions.

65.     While behavioral assessment is a key element to evaluate potential behavioral needs and problems, Noah's Landing Staff do not use a qualified professional, such as a Board-Certified Behavior Analyst to assess and address behavior pattern on those with developmental disabilities.

66.     Due to the publications and eligibility criteria for living at the Villages at Noah's Landing, One Hundred Percent (100%) of all eligible units are occupied by persons with intellectual or developmental disabilities. As a result of the occupancy being only for those with developmental or intellectual disabilities, the Defendants have imposed additional requirements and onerous conditions on the tenancy of the residents.

67.     Once a resident of the Villages at Noah's Landing, the resident is required to do the following:

a.  Residents/Legal representatives agree to provide a copy of their Med Waiver Support Plan annually along with any updates throughout the year. A Support plan includes all medical, behavioral, self-care, and support plans of the individual on the waiver.

b.  For those who do not receive waiver services, a resident or legal representative must provide the contact information for the primary, secondary, and other alternative individuals responsible for providing support services.

c. Residents and guardians must consent for Defendants to discuss any pertinent details regarding the resident to family members, legal representatives, Agency for Persons with Disabilities representatives, referral agencies, mental health counselors and/or other caregivers.

d. Legal representatives and/or responsible parties must respond to Defendant's inquiries within 48 hours for routine issues and less than 24 hours for emergencies.

68.    Notwithstanding the understanding that persons who are neurodiverse may have a need for therapy and interventions when having a behavior that is not appropriate, Noah's Landing Staff promulgated and enforced rules to punish and remove tenants that it deemed to be a problem.

69.    The terms of leases and rules and regulations at the Villages of Noah's Landing are much more stringent than those that would be tolerated by a neurotypical person (person who does not have a developmental or intellectual disability) as they mostly directly control the behavior of persons who predominately have a social disability:

a. Guests are permitted for three days/nights per month and must register with the Management office.

b. Residents must not engage in activities that disturb or threaten the rights, comfort, health, safety, or convenience of others.

c.  Residents must not behave in a loud or obnoxious manner.

d.  Residents must not disrupt the business operations of the community or injure its reputation by making bad faith allegations.

e.  Residents must communicate and conduct themselves in a lawful, courteous, and reasonable manner when interacting with employees, agents, independent contractors, vendors, other residents, occupants, guests, or any other person on the premises.

f.  Residents must not engage in any form of abusive behavior, whether verbal or physical, or any form of intimidation or aggression directed at employees, agents, independent contractors, vendors, other residents, occupants, guests, or any other person on the premises.

g.  Residents must not make, post, or publish information that contains the personal information or likeness of another person, or is libelous, harassing, abusive, obscene, vulgar, or inappropriate with respect to race, gender, sexuality, ethnicity, or other intrinsic characteristics.

h.  Residents must not make, post, or publish information that is false or misleading, or use the community's corporate names, slogans, images, photos, logos, internet domain names, trademarks, copyrights, or trade names without permission.

**Life at the Villages at Noah's Landing**

70.    For most recipients of FCHR funding for Supportive Housing, the provider of the developer or property manager has relationships built with other community service providers and have the ability to obtain funding from other funding sources,  So when the LURA and funding agreements require services to be provided, those services are not included in the award for funding, and are the responsibility of the housing provider at no additional cost to the resident.

71.    Noah's Landing Staff failed to make any agreements with outside foundations or other funders to pay for any of the activities promised in the LURA or the promises that were made to residents and their parents for their children's "forever homes."

72.    Noah's Landing Staff initially relied on the parents of the residents to provide activities to the residents.

73.    Due to this lack of funding and in order to get the ability to participate in activities and programs promised in the LURA, the resident was expected by Noah's Landing to enter into an activity agreement – a Lifestyle Enrichment Activity (LEA) fee - with the Noah's Landing for an additional $235.00 monthly fee and an additional $40.00 for cable and internet Wi-Fi for the duration of the rental agreement.

74.    When residents opted not to agree to the LEA contracts, the residents would not be permitted to participate in coordinated activities, independent living

skills classes, special events, activities and trainings were not provided, and were denied discount prices on meals, and the use of the Villages of Noah's Landing's van and access to off-site community-based activities.

75.    These activities and services were provided on the property paid for by FHFC and LIHTC funding.

76.    This additional payment for activities and programs was expected to be paid by the parent or legal guardian of the resident.

77.    Due to the low rental income and excess expenditures by the Noah's Landing Staff, they used the LEA fees to subsidize the entire operation, including all resident support services, transportation, as well as the services customarily provided to any resident of market rate properties.

78.    Notwithstanding the payment of the fees, the services became fewer and fewer, and when COVID Pandemic started in 2020, the activities became minimal and residents decided not to pay the LEA fees, and the agreements became optional.

79.    When the COVID Pandemic ended in 2022, Constance Bamberg, President/CEO of ROAR, contacted all tenants and demanded that LEA agreements were mandatory despite the paucity of services offered.

80.    While the rent burden as a percentage of salary is customarily thirty percent of such resident's income. The rent burden on the residents of Noah's

Landing was at an average of 47 percent of a resident's income (with the low at 25% and the high at 93%). With the $ 230.00 per month LEA fee, the resident's rent burden would be a low of 40 % and a high of 126%.

81.    The individual plaintiffs' rent burden was affected as follows:

a. Olivia Murphy, rent burden without LEA fee: 67.82%; With LEA fee: 97.19%. Murphy paid the LEA fee from 2016 to 2023.

b. Sara Gigowski, rent burden without LEA fee: 35.05%; With LEA fee: 57.82%. Gigowski paid the LEA fee from 2016 to 2021.

c. Sean Holland: rent burden without LEA fee: 59.31%; With LEA fee: 76.28%. Holland paid the LEA fee from 2016 until April of 2024.

d. Taylor Sells: rent burden without LEA fee: 71.78% ; With LEA fee: 101.15%. Sells paid the LEA fee from 2019 to 2021.

e. Austin Trueblood, rent burden without LEA fee: 41.72%; With LEA fee: 67.30%. Trueblood paid his LEA continuously since 2016.

82.    The parents and guardians of the residents were not advised of the effect of paying  monthly payments that were approximately $3,000 per year. As monthly payments on behalf of the residents, such amounts were considered income for both Supplemental Security Income as well as eligibility for low-income housing. If this income were reported, it would decrease a residents' SSI payment by an equivalent amount. If Noah's Landing accurately reported this income in the resident's

recertification forms and its monthly Tenant Income Certification, as it was obliged to, the resident would no longer be eligible for such housing.

83.    Accurately reporting income of residents is the essential element that is monitored by FHFC's agents and is central to the lenders retaining their tax credits over ten years.

84.    Those who paid were designated as VIPs and had access to the few programs and activities that Noah's Landing provided.

85.    Even when many of the residents paid the LEA fees, Noah's Landing could not provide the services and activities that Noah's Landing promised to the state, their lenders, and their residents, and due to the lack of activities, fewer residents would agree to pay the LEA fee.

86.    Because of such shortfalls, Noah's Landing was requiring residents to "volunteer" to work to provide activities and in doing gardening and maintenance activities on the Noah's Landing premises.

87.    To address the shortfall, in 2023, Noah's Landing started working towards an agreement with Lakeland Electric to open a Solar Power Farm on twenty acres on the Noah's Landing property that has a restrictive covenant limiting the property to low-income housing.

88.    As part of this plan to construct a Solar Power Farm, Noah's Landing planned a vertical greenhouse and other facilities powered by the solar farm to create

jobs for residents where they can grow, pack, and sell produce. In addition, Noah's Landing is planning to obtain animals to tend to the pasture where the solar farm is to be placed, and the residents would work and learn animal husbandry and make animal products, such as cheese and soap.

89.    Segregated work environments violate Title I of the Americans with Disabilities Act as a violation of the Olmstead Mandate, and such activities as a program and service of housing would violate the Fair Housing Act.

90.    One hundred years ago, the Florida Farm Colony for the Feebleminded, the State of Florida's first institution, engaged residents in similar agricultural activities. This included growing crops and raising livestock, which were essential parts of the colony's operations.

91.    In addition to being a segregated environment, having a disability-only work force at an agricultural facility requires skilled, on-side job coaches and constant supervision, but will be similar to the "volunteer" workers at Noah's Landing, who are exploited and who are not provided fair wages. A farm environment would also add issues relating to reasonable working hours, and safe working conditions.

**Application of Rules and Regulations to Residents and Guardians**

92.    The rules and regulations were enforced on residents for behavioral manifestations of their disability.

93.     Residents, including Plaintiffs herein, have been penalized and threatened with eviction for physical or verbal behaviors which are a manifestation of a developmental or intellectual disability. In addition to misinterpreting social cues which may lead to inappropriate behaviors, some persons with autism may have emotional meltdowns, outbursts, or aggression in reaction to sensory overstimulation or disrupted routine.

94.     None of these verbal or physical behaviors of the tenants constituted a direct threat to the health and safety of others that could not be mitigated by a reasonable accommodation.

95.     By Noah's Landing obtaining all the residents' support plans and medical records, Noah's Landing had actual knowledge of the extent and nature of their disability, as well as methods to mitigate any perceived direct threat.

96.     From Noah's Landing Staff's asserted knowledge and experience relating to the needs of persons with intellectual or developmental disabilities, any issue presented could have been mitigated by Applied Behavior Analysis (ABA) therapy through a qualified behavioral analyst to address the specific behavior.

97.     However, even when therapy was requested as a reasonable accommodation, the policy of Noah's Landing was, and continues to be, that Noah's Landing has a "zero tolerance policy" for any physical manifestations that break the rules.

98.     Because of the overall lack of behavioral supports, the dangerous or antisocial behavioral manifestations were ignored especially for those who were in favor of Noah's Landing's management.  Such neglect led to an environment where persons with disabilities were verbally, physically, and/or sexually assaulted.

99.     In some of these circumstances, the Lakeland Police Department was called.

100.    Furthermore, if a guardian did not comply with the conduct rules, the guardian would be barred from the premises and could not attend meetings or speak for their ward/child. The ability to attend a meeting in lieu of a child who does not have the legal competence to make a decision is a basic accommodation that was well understood in the community.

**Complaints of Plaintiffs and their Guardians**

101.    Beginning in 2022, the guardians of the plaintiffs and others had expressed significant dissatisfaction with the treatment of residents and the overall environment in the Villages. There was a lack of activities and a toxic atmosphere created by the leadership. The guardians of the plaintiffs have noted that their children feel uncomfortable and unsafe, leading to feelings of anxiety, depression, sadness, and loneliness. The guardians had repeatedly requested meetings with the administration to discuss these issues, but their requests have often gone

unanswered, resulting in frustration and a lawsuit relating to the restrictions imposed on their participation.

102.    There were serious concerns about the safety and security of the premises. Both gates were reportedly non-functional, the security cameras were not working, and there was poor lighting around the community at night, which raised safety concerns. Additionally, these guardians expressed concern about the use of the community kitchen by an external catering company, who employed individuals with criminal records.

103.    Guardians had raised issues regarding the financial transparency of the Villages. They had requested detailed financial reports to understand how donations and grants were being spent. Guardians were also troubled by the introduction of a VIP status to separate residents who pay the Lifestyle Enrichment Activity (LEA) fees from those who do not, unfairly segregating resident children into the haves and the have-nots.

104.    There were numerous complaints about the communication and management practices at Noah's Landing. Guardians complained about inconsistent enforcement of community rules, with some residents feeling targeted while others were allowed to violate rules without consequences. They had expressed frustration with the lack of transparency and the administration's refusal to provide incident reports or video evidence when requested. The management's handling of these

issues has led to a strained relationship with these and other residents' families, who feel intimidated and threatened by Noah's Landing Staff.

105.   Bullying is a significant concern among the residents and their families. Plaintiffs and other guardians and parents have reported instances of bullying by both staff members and other residents.

106.   Behaviors of residents that resulted due to the bullying were not addressed and services related to those behaviors were not provided. Depending on the resident, these behaviors were tolerated or permitted. Noah's Landing Staffs' dismissive attitude towards these complaints has exacerbated the problem, leading to a hostile and adversarial environment.

107.   When there were violations or complaints against guardians or residents, these were focused on the limitations of speech and conduct. An example of such conduct that led to a threat of eviction was that residents were told that they could only wear "ROAR" T-shirts when they went on the community van and directed not to wear specific clothing in and out of the community.

108.   As per the rules of the lease, the complaints, especially public complaints, were a material lease violation and this provision was threatened and used by the Defendants to suppress dissenting voices. This included discouraging guardians from speaking out at meetings and threatening legal action against those who criticized the management.

109.    Each of the RESIDENTS has been personally affected by the discriminatory actions of the Defendants herein.

110.    Each of the guardians of the Residents were faced with the issue of their adult son or daughter living in their home, and they believed that they had no option other than providing housing or care for their son or daughter.

111.    ROAR and RAM held out Noah's Landing as a "forever home" for their sons and daughters, where the RESIDENTS would be able to live on the income and benefits received by the government, and have the care and supportive services they need, which included activities, employment, socialization and management of healthcare.

112.    ROAR and RAM held out Noah's Landing as an affordable housing development where it would be safer because it was populated solely by others similar to their sons and daughters, and the others would be kept out by security, cameras, and gates.

113.    Based on these representations, and the lack of alternatives, each Guardian decided that Noah's Landing would be the place for their son or daughter.

114.    Even though the rent constituted much of their monthly income, the Parents were advised that their sons and daughters would not receive transportation and activities if they did not agree to pay a substantial additional fee.

115.   At all times, all defendants had actual knowledge that these services were required to be included without additional change within the services provided according to the application, LURA, and restrictive covenants. Furthermore, since most of its common area costs were mischaracterized in its FHFC application as the eligible basis, Defendants could not charge tenants additional fees for services at these facilities. Defendants had a duty to make such disclosure. Defendants had special knowledge of material facts that the residents and their guardians did not have.

116.   The community center, which is supposed to be a common area for all residents, is only used for VIP activities, such as BINGO from which the residents who do not pay the LEA fee are barred. Further, the community center is rented to Atala for group therapy sessions closed to persons who live at the development.

117.   Guardians are key advocates for their children, particularly those with developmental disabilities. However, some have been barred from resident meetings.

118.   Family members who complain to the Defendants are restricted to their son's or daughter's apartments and are not permitted elsewhere on the property and cannot attend any events or functions with their loved ones.

119.   Enforcement of a quiet hour policy starts at 9 PM, and residents, such as MURPHY, were told that they could not do laundry or take showers after 9 PM.

120.    Residents at Noah's Landing, including Sean, Sarah, Olivia, and Tyler, have faced challenges with roommate issues. Transferring from a bad roommate situation is extremely difficult and can take years of effort. Moreover, there is a $500 fee for transferring to a different apartment, which adds a financial burden on the residents and their families.

121.    Defendant ATALA was brought in to digitize all the resident records, oversee the resident advisors, and address roommate issues. Atala was also responsible for reviewing resident complaints about each other, sending disciplinary warnings and threats of eviction when enforcing the lease provisions.

122.    Residents have inappropriately and unjustly been accused of multiple violations, including behaving in a loud or obnoxious manner, disturbing or threatening the rights of others, disrupting business operations, and making bad faith allegations. These accusations have led to disciplinary actions and threats of eviction or non-renewal of leases. The process for addressing these accusations is often unclear and lacks transparency, causing stress and anxiety for the residents.

123.    Residents have also been inappropriately and unjustly accused of failing to communicate and conduct themselves appropriately when interacting with staff, other residents, and visitors. This includes accusations of engaging in abusive behavior, intimidation, or aggression. These accusations have led to severe consequences, including threats of eviction.

124.   Residents have been inappropriately and unjustly accused of making, posting, or publishing information that is deemed inappropriate, such as personal information or content that is libelous, harassing, abusive, obscene, or vulgar. These accusations have exposed residents to disciplinary actions and have further strained the relationship between residents and management.

125.   In some cases, aspects of residents' disabilities have been deemed too dangerous or unfit for residency at Noah's Landing. This discriminatory practice has caused significant distress for residents and their families, as it undermines their right to fair and equal housing.

126.   The process for addressing these threats is often opaque and lacks due process, causing uncertainty and fear among residents.

127.   When residents wish to file complaints, they are required to fill out a lengthy five-page form. This bureaucratic process can be daunting and discourages residents from voicing their concerns. Additionally, there is a risk of lease termination for making false claims, which further deters residents from filing complaints.

**Effects on Named Plaintiffs – Failure to Integrate**

128.   By excluding neurotypical persons from the Villages at Noah's Landing, the Residents were deprived of the social and professional benefits of living in an integrated community. For independent, neurodiverse people, this

includes making friends with neurotypical people who could go to events, such as movies, restaurants, and sporting events. It also limits their professional benefits, such as finding work and being mentored with a neurotypical person who is a neighbor.

129.    Failure to have an inclusive environment deprived individuals with a developmental disability of the opportunity to interact with their neurotypical peers, which can help them develop essential social skills, reduce stigma, and deprived them of a sense of belonging and community, which would significantly improve the emotional well-being of individuals with autism.

**Effects of Segregation– Failure to grant accommodations and disparate treatment**

130.    Autistic individuals may sometimes engage in socially inappropriate behaviors due to difficulties with social understanding and communication. These behaviors often stem from difficulties with social understanding, communication, and sensory processing.

131.    Furthermore, autistic individuals may not fully grasp social norms regarding privacy and appropriate behavior. Autistic individuals, especially autistic women are at a higher risk of experiencing sexual violence compared to their neurotypical peers.

132.   This bullying, either sexual, physical, or emotional, when left unaddressed with behavioral therapy, caused a hostile and uncomfortable living situation.

133.   According to police records, the incidence of police calls for disturbances, assaults, and other behavioral issues are prevalent at The Villages at Noah's Landing.

134.   Failure to address these behaviors by the defendants led to a situation which would not be encountered in an integrated environment.

135.   In most situations, the actions or behaviors do not pose a direct threat incapable of being mitigated by other reasonable accommodations.

136.   The reasonable accommodation with maladaptive behaviors is behavioral therapy to address maladaptive behavior.

137.   The failure to comply with the promises in which funding was provided resulted in the failure to provide programs, such as sexual education programs, which would help people with developmental or intellectual disabilities to be taught appropriate behavior to be able to live independently.

138.   A "zero tolerance" policy is a denial of reasonable accommodations to address and mitigate any perceived potential direct threat.

139.   The effect of a "zero tolerance" policy when there is no direct threat incapable of being otherwise mitigated with a reasonable accommodation results in a denial of rights based on the resident's disability.

140.   Due to the overly restrictive behavioral rules and regulations, and the selective enforcement of these rules, each of the plaintiffs have been penalized and threatened with eviction for behaviors that are common with persons who are neurodiverse.

141.   In addition, because of the failure to comply with the promises in which funding was provided, the Defendants have failed to provide qualified personnel who could provide behavioral interventions to address maladaptive behaviors.

**Effects of Segregation on Named Plaintiffs – Harsh Terms and Conditions**

142.   Because of perceived differences of persons with disabilities and to exert control over the residents with disabilities and their family, the Defendants promulgated and enforced rigid rules intended to control behaviors. These conduct rules were enacted and enforced solely due to disability.

143.   These conduct rules were applied against residents and their guardians to dissuade them from requesting programs and services which they were promised as part of Noah's Landing's financing package and the publications issued to guardians  about the facility.

144.   Defendants non-renewed and threatened to evict residents due to conduct of the residents which are not deemed to be good cause and are therefore prohibited.

145.   As a result of the Defendants' actions described above each of the Plaintiffs suffer and continue to suffer irreparable loss and injury including, but not limited to, humiliation, embarrassment, emotional distress, and deprivation of their right to equal housing opportunities regardless of their disability.

146.   As an experienced housing provider, ROYAL ASSOCIATION MANAGEMENT has training and knowledge of the requirements of the Fair Housing Act, and the requirements to make housing available to persons with disabilities and not to discriminate against persons with disabilities.

147.   Defendants acted in reckless disregard for the federally protected rights of RESIDENTS and are liable for punitive damages.

148.   RESIDENTS have retained the Nova Southeastern University Shepard Broad College of Law's Disability Inclusion and Advocacy Law Clinic and Searcy Denney Scarola Barnhart & Shipley, P.A  to represent them in this case and have agreed to pay them a reasonable fee for their services.

149.   The RESIDENTS have complied with all necessary conditions precedent to the bringing of this action, or such conditions precedent has been waived.

## CLASS ALLEGATIONS FOR STATE LAW CLAIMS

150.    Solely for purposes of their state law claims, Plaintiffs seek to represent a class defined as all tenants of the Villages at Noah's Landing related to the failure to provide activities without charge pursuant to the LURA and LIHTC application.

151.    Numerosity: The class is so numerous that joinder of all members is impracticable. Plaintiffs estimate the class to include approximately three hundred individuals that were denied services and activities or who unnecessarily paid additional money for services or activities. The number and identities of all class members can be determined through appropriate discovery in the possession of Defendants.

152.    There are questions of law or fact common to the class, which include but are not limited to the following:

a.    Whether Plaintiffs and class members have standing as third-party beneficiaries to agreements between Defendant the VILLAGES OF NOAH'S LANDING, and the Florida Housing Finance Corporation.

b.    Whether Defendants VILLAGES OF NOAH'S LANDING, ROAR, and RAM unlawfully charged Plaintiffs and class members for services or activities that were financed in whole or in part with tax credit agreements.

c. Whether Defendants VILLAGES OF NOAH'S LANDING, RAM and ROAR Should be enjoined from future unlawful charges for services or activities.

d. Whether Defendants VILLAGES OF NOAH'S LANDING, RAM, and ROAR intended to deceive Plaintiffs and class members by negotiating, entering, and enforcing addenda to leases that required unlawful additional payments for services or activities.

e. Whether Defendants VILLAGES OF NOAH'S LANDING, RAM, and ROAR's conduct violated Florida law, including Florida's Unfair and Deceptive Trade Practices Act against Persons with Disabilities.

f. Whether Defendants VILLAGES OF NOAH'S LANDING, RAM, and ROAR were unjustly enriched by charging additional fees for services or activities that were either included in financing agreements or in property constructed using LIHTC.

g. Whether Plaintiffs and class members sustained an economic loss and, if so, the proper measure of damages.

h. Whether Defendants VILLAGES OF NOAH'S LANDING, RAM and ROAR should be assessed a civil fine for their violation of the Florida Unfair and Deceptive Trade Practices Act against persons with Disabilities.

153. Plaintiffs' claims are typical of the claims of the class as a whole. Like Plaintiffs, class members were injured by paying additional fees for services or activities that had been financed using LIHTC. Thus, Plaintiffs and class members have all suffered the same or similar injury because of Defendants' VILLAGES OF NOAH'S LANDING, RAM, and ROAR.'s fraudulent and deceptive practices.

154. Plaintiffs are committed to pursuing this action and have retained counsel who is uniquely qualified, experienced, and capable of conducting the litigation and representing the interests of the entire class. Plaintiffs know of no conflicts of interest among class members.

155. The common questions of law and fact enumerated above predominate over questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy. The likelihood that individual class members will prosecute separate actions is remote given the excessive time and considerable expense necessary to conduct such litigation, especially given the relatively modest amount of monetary, injunctive, and equitable relief at issue for each individual class member.

156. Defendants have acted or refused to act on grounds generally applicable to the proposed class, thereby making appropriate final injunctive and equitable relief with respect to the class as a whole. Many class members continue to live and pay additional fees for services or activities at the Villages at Noah's Landing and

are therefore in danger of being harmed again. Defendants should be ordered to notify class members that it will cease collecting additional payments for services or activities.

157.    Defendants' ongoing and systematic practices are applied uniformly to class members, making declaratory relief appropriate.

158.    The prosecution of separate actions by or against individual class members would create a risk of:

a.  Inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Defendants; and

b.  Adjudications with respect to individual class members would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

## COUNT I–DECLARATORY AND INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS – 42 U.S.C. § 3604(f)(1)

159.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 158 above as though fully set forth herein.

160.    Defendants owned and operated a multi-family housing development, have engaged in a pattern of discriminatory practices by failing to allow neurotypical persons to reside in the development, thereby depriving individuals with

developmental and intellectual disabilities of the social and professional benefits of living in an integrated community.

161.  Under 42 U.S.C. 3604(f)(1), it is unlawful to refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of one's disability. The Fair Housing Act aims to eliminate discriminatory practices and promote integrated living environments.

162.  The policy and practice of excluding neurotypical persons from the Villages at Noah's Landing has a discriminatory effect on individuals with disabilities by limiting their opportunities for social interaction and professional networking,

163.  As between a fully integrated development and the Villages at Noah's Landing, the rules, practices, and limitations stigmatized the Villages at Noah's Landing making it seem more like an institution for the developmentally and intellectually disabled and not "supported" housing.

   a.  Invasion of Privacy: The Noah's Landing Staff took it upon themselves to deeply understand the nature and extent of each resident's disability. This included comprehensive skills assessments covering life/home skills, self-care, mobility, functional skills, health & safety, and behavioral

assessment. This level of scrutiny and invasion into personal lives is not typical in regular developments but in institutions.

b. Harsh Rules and Penalties: The residents of The Villages at Noah's Landing are subjected to strict rules and regulations that are enforced by the management. These rules can be harsh and punitive, creating an environment that feels more like an institution than a home.

c. Speech restrictions: The residents of The Villages at Noah's Landing and their legal guardians suffer significant infringement upon their freedom to communicate openly and honestly is taken away. These restrictions prevent them from publicly criticizing the management or operations of the facility, disclosing any internal issues or conflicts, and sharing relevant information about the facility or other residents. This creates an environment of fear and control, where tenants and their parents are unable to freely express their concerns or seek help.

d. Financial Exploitation: Residents of the Villages at Noah's Landing are paying most of their income for a facility that takes most of their money and victimizes them. This financial burden is significantly higher compared to regular developments where residents have more financial freedom and less exploitation.

e. Lack of Community Integration: Large-scale developments like the Villages at Noah's Landing are deemed presumptively institutional because they do not provide community-based services, supports, and enrichment activities that are commonly provided within an integrated environment. In common terms, they do not have neurotypical neighbors who can drive to a movie theater, see a movie, and go out to dinner. This isolation from the broader community can be detrimental to the residents' social and emotional well-being.

164.    The Fair Housing Act does not permit any discrimination (benign or with animus) for housing that discriminates for or against an individual in any protected class or contains a quota for occupancy by any protected class. The only exception to an otherwise qualified dwelling would be discrimination based upon familial status under the Housing for Older Persons Act.

165.    The Defendants' policy and practice of denying or making unavailable housing for persons based on the existence of a disability constitutes a violation of 42 U.S.C. 3604(f)(1) of the Fair Housing Act.

WHEREFORE, Plaintiffs, MARK MURPHY AND MARIA MURPHY, as guardians of OLIVIA MURPHY, BERNITA GIGOWSKI as guardian of SARAH MELISSA GIGOWSKI, DEBORAH HOLLAND as guardian of SEAN HOLLAND, LUANNE SELLS, as guardian of TYLER RAYMOND SELLS, and

SUZANNE PREVATT TRUEBLOOD, as guardian of AUSTIN JAMES TRUEBLOOD, demand judgment against Defendants, VILLAGES AT NOAH'S LANDING LTD., NOAH'S ARK OF CENTRAL FLORIDA, INC. d/b/a ROAR FLORIDA, ATALA CONSULTING, LLC, ROYAL AMERICAN MANAGEMENT, INC., and CONSTANCE BAMBERG, to declare that the aforedescribed actions of the Defendants violated their rights; to award the PLAINTIFFS injunctive relief to prohibit such discriminatory actions;, to require extensive training on the mandates of the fair housing act; to award attorneys' fees and costs; and to grant such other and further relief as the court deems appropriate.

### COUNT II– VIOLATION OF 42 U.S.C. § 3604(c) as to All Defendants

166.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 158 above as though fully set forth herein.

167.    By printing and promulgating discriminatory rules and regulations, the Defendants have violated 42 U.S.C. § 3604(c) "[t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination."

168.    All Defendants were personally involved in, authorized, and enforced discriminatory publications that expressed a preference for persons with disabilities, and against those who did not have disabilities.

169.    Every publication issued or uttered by the Defendants relating to the Village of Noah's Landing includes its preference and dedication to solely persons with intellectual and developmental disabilities both in text and images.

170.    By publishing the eligibility criteria and holding itself out as a community for persons with intellectual or developmental disabilities, the Defendants violated the Act by restricting or attempt to restrict the choices of a person by word or conduct in connection with seeking or renting a dwelling so as to perpetuate, or tend to perpetuate, segregated housing patterns, or to discourage or obstruct choices in a community, neighborhood or development.

171.    Defendants' actions were in total and reckless disregard of Plaintiffs' rights.

WHEREFORE, Plaintiffs, MARK MURPHY AND MARIA MURPHY, as guardians of OLIVIA MURPHY, BERNITA GIGOWSKI as guardian of SARAH MELISSA GIGOWSKI, DEBORAH HOLLAND as guardian of SEAN HOLLAND, LUANNE SELLS, as guardian of TYLER RAYMOND SELLS, and

SUZANNE PREVATT TRUEBLOOD as guardian of AUSTIN JAMES TRUEBLOOD, demand judgment against Defendants, VILLAGES AT NOAH'S LANDING LTD., NOAH'S ARK OF CENTRAL FLORIDA, INC. d/b/a ROAR FLORIDA, ATALA CONSULTING, LLC, ROYAL AMERICAN MANAGEMENT, INC., and CONSTANCE BAMBERG, awarding PLAINTIFFS injunctive relief to prohibit such discriminatory actions, require extensive training on the mandates and restrictions of the fair housing act, awarding compensatory and punitive damages, and awarding attorneys' fees and costs, and such other and further relief as the Court deems appropriate.

### COUNT III–FAIR HOUSING ACT VIOLATION AS TO ALL DEFENDANTS - 42 U.S.C. § 3604(f)(1)

172.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 158 above as though fully set forth herein.

173.    Defendants have threatened to evict or non-renew Plaintiffs' leases based upon their disabilities.

174.    The Fair Housing Act does not allow for exclusion of individuals based upon fear, speculation, or stereotype about a particular disability or persons with disabilities in general.

175.    The Defendants had knowledge of the Plaintiffs' disabilities and issued violations, threatened to evict, and not renew tenancies based on a manifestation of a disability.

176.    Notwithstanding the actual knowledge that the purported violations were a manifestation of a disability, Defendants failed to have a policy to or make a determination that Plaintiffs posed a direct threat on an individualized assessment that is based on reliable objective evidence including considering: (1) the nature, duration, and severity of the risk of injury; (2) the probability that injury will actually occur; and (3) whether there are any reasonable accommodations that will eliminate the direct threat.

177.    Further, as a direct and proximate result Defendants' discrimination the Plaintiffs have suffered irreparable loss and injury including, but not limited to actual damages, humiliation, emotional distress, and deprivation of the right to equal housing opportunities regardless of disability.

WHEREFORE, Plaintiffs, MARK MURPHY AND MARIA MURPHY, as guardians of OLIVIA MURPHY, BERNITA GIGOWSKI as guardian of SARAH MELISSA GIGOWSKI, DEBORAH HOLLAND as guardian of SEAN HOLLAND, LUANNE SELLS, as guardian of TYLER RAYMOND SELLS, and SUZANNE PREVATT TRUEBLOOD, as guardian of AUSTIN JAMES TRUEBLOOD, demand judgment against Defendants, VILLAGES AT NOAH'S LANDING LTD., NOAH'S ARK OF CENTRAL FLORIDA, INC. d/b/a ROAR FLORIDA, ATALA CONSULTING, LLC, ROYAL AMERICAN MANAGEMENT, INC., and CONSTANCE BAMBERG, to declare that the actions

of the Defendants violated the Fair Housing Amendments Act; award the PLAINTIFFS injunctive relief to prohibit such discriminatory actions; require extensive training on the mandates and restrictions of the Fair Housing Act; awarding compensatory and punitive damages, awarding attorneys' fees and costs, and granting such other and further relief as the Court may deem appropriate.

## COUNT IV- FAILURE TO REASONABLY ACCOMMODATE IN VIOLATION OF 42 U.S.C. § 3604(f)(3) AS TO ALL DEFENDANTS

178.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 158 above as though fully set forth herein.

179.    Pursuant to 42 U.S.C. § 3604(f)(3)(b), it is unlawful to refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling.

180.    An individual seeking reasonable accommodations for a disability need not use "magic" words or explicitly mention the words "fair housing act" or "reasonable accommodation."

181.    Defendants' policy contains specific behavioral and speech expectations for residents, and those who violate the rules face penalties such as fines, restrictions on activities, or even eviction.

182.   Defendants enforce a zero-tolerance approach to any violations of the community rules. This means that any breach of the rules, no matter how minor, can result in immediate consequences.

183.   All Plaintiffs have been threatened with eviction and have asked for modification of the zero-tolerance policy and the accommodation for therapies.

184.   As a zero-tolerance policy, Defendants stated that there were no accommodations that could be provided.

185.   Defendants have also refused to allow Guardians of the Residents to attend meetings or go to the facility. It is a well understood accommodation that the residents are under guardianship and cannot make decisions on their own. Denying the guardians the ability to go to the Villages of Noah's Landing or attend meetings is a denial of a reasonable accommodation that would not be an undue burden or fundamental alteration of their services.

186.   Such actions by Defendants were in total and reckless disregard of the Plaintiffs rights and indifferent to Plaintiffs' disabilities and related needs.

187.   Further, as a direct and proximate result of Defendants' discrimination, the Plaintiffs have suffered irreparable loss and injury including, but not limited to actual damages, humiliation, emotional distress, and deprivation of the right to equal housing opportunities regardless of disability.

WHEREFORE, Plaintiffs, MARK MURPHY AND MARIA MURPHY, as guardians of OLIVIA MURPHY, BERNITA GIGOWSKI as guardian of SARAH MELISSA GIGOWSKI, DEBORAH HOLLAND as guardian of SEAN HOLLAND, LUANNE SELLS, as guardian of TYLER RAYMOND SELLS, and SUZANNE PREVATT TRUEBLOOD, as guardian of AUSTIN JAMES TRUEBLOOD, demand judgment against Defendants, VILLAGES AT NOAH'S LANDING LTD., NOAH'S ARK OF CENTRAL FLORIDA, INC. d/b/a ROAR FLORIDA, ATALA CONSULTING, LLC, ROYAL AMERICAN MANAGEMENT, INC., and CONSTANCE BAMBERG, declaring that the actions of the Defendants violated the Fair Housing Amendments Act, in the manner set forth above; awarding the PLAINTIFFS injunctive relief to prohibit such discriminatory actions; requiring extensive training on the mandates and prohibitions of the fair housing act; awarding compensatory and punitive damages; and awarding attorneys' fees and costs.

### COUNT V– FAIR HOUSING AMENDMENT ACT VIOLATION AS TO ALL DEFENDANTS - 42 U.S.C. § 3604(f)(2)

188.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 158 above as though fully set forth herein.

189.    The foregoing conduct of Defendants constitutes discrimination against any person in the terms, conditions, and privileges of sale or rental of a dwelling, or

in the provision of services or facilities in connection with such dwelling, because of disability, and consequently, is discriminatory and unlawful.

190. The Defendants violated the Act discriminating against Plaintiffs in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of their disability, which is prohibited by 42 U.S.C. § 3604(f)(2).

191. As a property management company that manages fully integrated affordable housing properties, RAM had a set of rules that were applicable to neurotypicals for integrated housing, and harsh rules that were applicable to the neurodiverse.

192. Defendants' actions were done with knowledge of the unlawfulness of their acts and in total and reckless disregard of Plaintiffs' rights.

WHEREFORE, Plaintiffs, MARK MURPHY AND MARIA MURPHY, as guardians of OLIVIA MURPHY, BERNITA GIGOWSKI as guardian of SARAH MELISSA GIGOWSKI, DEBORAH HOLLAND as guardian of SEAN HOLLAND, LUANNE SELLS, as guardian of TYLER RAYMOND SELLS, and SUZANNE PREVATT TRUEBLOOD, as guardian of AUSTIN JAMES TRUEBLOOD, demand judgment against Defendants, VILLAGES AT NOAH'S LANDING LTD., NOAH'S ARK OF CENTRAL FLORIDA, INC. d/b/a ROAR FLORIDA, ATALA CONSULTING, LLC, ROYAL AMERICAN

MANAGEMENT, INC., and CONSTANCE BAMBERG, declaring that the actions of the Defendants violated the Fair Housing Amendments Act, in the manner set forth above; awarding the PLAINTIFFS injunctive relief to prohibit such discriminatory actions; requiring extensive training on the mandates and prohibitions of the fair housing act; awarding compensatory and punitive damages; and awarding attorneys' fees and costs.

## COUNT VI–UNFAIR AND DECEPTIVE TRADE PRACTICES CLAIM

### (CLASS COUNT AGAINST VILLAGES AT NOAH'S LANDING LTD., NOAH'S ARK OF CENTRAL FLORIDA, INC. d/b/a ROAR FLORIDA, and ROYAL AMERICAN MANAGEMENT, INC.- 501.204(1) Fla. Stat)

193.   Plaintiffs individually and on behalf of others similarly situated, repeat and reallege the allegations contained in paragraphs 1 through 158 above as though fully set forth herein.

194.   At all times material hereto, Defendants Villages at Noah's Landing, ROAR and RAM were engaged in trade or commerce within the meaning of Florida's Deceptive and Unfair Trade Practices Act (FDUTPA) 501.204(1) Fla. Stat.

195.   Defendants engaged in deceptive and unfair trade practices by:

a.   promising to provide affordable housing and provide supportive services to residents with disabilities, in exchange for which promises the Defendants received almost $15 million;

b. Failing to provide such services or charging $230 per month per resident for services required to be provided to residents without any extra charge;

c. Charging Plaintiffs approximately 70% of a resident's income (on average) on housing, when the HUD guidance for rent for housing requires a person to pay only 30% of their income or salary;

d. Charging excessive amounts for other services, such as $500 to change units when roommates are not compatible.

e. Failing to disclose the LEA payments as income in the rental recertification required by LIHTC, which is a violation of the program's requirements; and

f. Failing to disclose that the LEA payments jeopardized the residents' eligibility for receipt of Supplemental Security Income (SSI) by increasing residents' income above maximum eligibility limits.

196.  Defendant's Villages at Noah's Landing, ROAR and RAM deceptive and unfair trade practices victimized or attempted to victimize Plaintiffs and others similarly situated, persons with a disability, in violation of Florida Statute 501.2077.

197.  As a direct and proximate result of Defendant's Villages at Noah's Landing, ROAR and RAM's deceptive and unfair trade practices, Plaintiffs and others similarly situated have suffered actual damages, including but not limited to $230.00 per month per resident.

198.  Such amounts constitute the extra amounts Residents paid for services that they should have received without costs, and Residents who did not pay for services and did not receive services, lost the value of the services that they should have received.

199.  Pursuant to Florida Statute 501.2077, Plaintiffs are entitled to recover actual damages, attorney's fees, and court costs.

200.  Additionally, Plaintiffs individually and on behalf of others similarly situated seek a civil penalty of not more than $15,000 for each person for each month since 2016 as Defendants' actions were willful and Defendants knew or should have known that their conduct was unfair or deceptive.

WHEREFORE, Plaintiffs, MARK MURPHY AND MARIA MURPHY, as guardians of OLIVIA MURPHY, BERNITA GIGOWSKI as guardian of SARAH MELISSA GIGOWSKI, DEBORAH HOLLAND as guardian of SEAN HOLLAND, LUANNE SELLS, as guardian of TYLER RAYMOND SELLS, and SUZANNE PREVATT TRUEBLOOD, as guardian of AUSTIN JAMES TRUEBLOOD, individually and on behalf of others similarly situated demand judgment against Defendants, VILLAGES AT NOAH'S LANDING LTD., NOAH'S ARK OF CENTRAL FLORIDA, INC. d/b/a ROAR FLORIDA, ROYAL AMERICAN MANAGEMENT, INC., awarding actual damages; imposing a civil penalty of not more than $15,000 per person for each violation of Florida Statute

501.2077; awarding Attorney's fees and costs pursuant to Florida Statute 501.2075; as well as such other and further relief as this Court deems just and proper.

### COUNT VII–BREACH OF CONTRACT AS THIRD PARTY BENEFICIARIES  (CLASS COUNT AGAINST THE VILLAGES AT NOAH'S LANDING LTD.)

201.   Plaintiffs individually and on behalf of others similarly situated, repeat and reallege the allegations contained in paragraphs 1 through 158 above as though fully set forth herein.

202.   The Villages at Noah's Landing, LTD, executed an Extended Low-Income Housing Agreement ("ELIHA") with the Florida Housing Finance Corporation requiring the owner to conform to very specific requirements relating to the construction, occupancy limitations, and amenities provided by the Village of Noah's Landing.

203.   The ELIHA deems incorporated other FHFC program documents, including land use restriction agreements, Applications, Requests for Proposals, and the terms of the ELI Loan, and SAIL Loan.

204.   Defendant has failed to fulfill its obligations under the contract by failing to develop facilities providing certain services and operational standards required under the contract.

205.   The obligations breached by Defendant are material because they go to the essence of the agreement. Defendant specifically entered into the ELIHA with

the Corporation to ensure full social and employment integration into the fabric of the community in accordance with specially contracted guidelines. A failure to provide such services is tantamount to institutionalized placement.

206.   The ELIHA and the covenants therein run with the land and its benefits inure to the residents of the Villages at Noah's Landing.

207.   The ELIHA contains a reliance provision wherein Defendant specifically agreed to that the representations and covenants made therein may be relied upon "all persons interested in the legality and validity of the [Defendant's] use of the Tax Credits."   Furthermore, the ELIHA contains an enforcement provision providing a remedy for tenant and the FHFC in the event Defendant default in the performance of its obligations therein, as well as the breach of any covenant, agreement, or warranty of the ELIHA. Plaintiffs and others similarly situated are third party intended beneficiaries of a contract between the Florida Housing Finance Corp and The Villages of Noah's Landing, the terms which were intended to benefit Plaintiffs and others similarly situated primarily and directly.

208.   By charging Plaintiffs and all low-income residents $230.00 per month for services for which were to be provided to residents without any additional charge breached constitutes a breach of this contract.

209.   By failing to provide Plaintiffs who chose not to pay the additional $230 per month, the Defendant failed to provide services that were promised in the agreement, and thus the contract was breached.

210.   All Plaintiffs and all residents of the Villages at Noah's Landing are entitled to the full benefits of the contract which has been breached causing damages of $ 230.00 per month.

WHEREFORE, Plaintiffs, MARK MURPHY AND MARIA MURPHY, as guardians of OLIVIA MURPHY, BERNITA GIGOWSKI as guardian of SARAH MELISSA GIGOWSKI, DEBORAH HOLLAND as guardian of SEAN HOLLAND, LUANNE SELLS, as guardian of TYLER RAYMOND SELLS, and SUZANNE PREVATT TRUEBLOOD, a guardian of AUSTIN JAMES TRUEBLOOD, individually and on behalf of others similarly situated demand judgment against Defendant, VILLAGES AT NOAH'S LANDING LTD., declaring that the Defendant breached its contractual obligations to the residents of the Village of Noah's Landing as third party beneficiaries of the FHFC contract, and are entitled to actual damages for the breach of the contract as well as such other and further relief as the Court deems just and proper.

## COUNT VIII–FRAUD
## (AGAINST VILLAGES AT NOAH'S LANDING LTD., NOAH'S ARK OF CENTRAL FLORIDA, INC. d/b/a ROAR FLORIDA, and ROYAL AMERICAN MANAGEMENT, INC.,)

211.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 158 above as though fully set forth herein.

212.   By intentionally and systematically misrepresenting the costs associated with public areas financed through Tax Credits and charging residents for their use, Defendants fraudulently charged tenants for services which they could not lawfully charge. Defendants thereby made material misrepresentations to the Plaintiffs to perpetrate fraud.

213.   Defendants intended that the Plaintiffs rely on these fraudulent misrepresentations. Defendants knew that these fraudulent misrepresentations were false when made. These fraudulent misrepresentations were profitable because Defendants knew they could wrongly induce residents to pay for the use of public areas.

214.   Having elected to finance public areas with Tax Credits, Defendants were not permitted to charge Plaintiffs separately for their use because Defendants represented to Plaintiffs that the premises were, are, and would be operated in accordance with the requirements of the low-income housing credit program.

215.   That statement was a misrepresentation of material fact. Defendants knew that the statement was false when it was made. That misrepresentation is material—and indeed, critically important to residents in deciding where to live and in all aspects of their relationships with Defendants, and Plaintiffs reasonably relied

on the Defendants' false statements when establishing their residences at the Villages of Noah's Landing and when making all associated payments.

216.    Defendants' misrepresentations stand in a causal nexus to the harm suffered by the affected residents. Indeed, the central feature of Defendants' fraudulent scheme was to profit by obtaining both Tax Credits premised on an inflated eligible basis and collecting payment for the use of public areas from residents. So, residents' payments are linked at the core of Defendants' fraud.

217.    Because the misrepresentations were made at the point of contract formation, the Court is empowered to rescind the contracts and disgorge Defendants' ill-gotten gains, including the full amount of rent paid by Plaintiffs as restitution and rescission damages. At the very least, Defendants should not be allowed to profit from their fraud. Accordingly, the Court is empowered to disgorge all profits made on all affected resident leases.

218.    Defendants intentionally and fraudulently charged Plaintiffs additional fees for the use of public areas. Accordingly, the Court is empowered to award as damages all fraudulently charged fees.

219.    In making affirmative misrepresentations to residents, Defendants failed to disclose to its residents that, because most its public area costs were mischaracterized in its Tax Credit application as eligible basis, Defendants could not charge residents additional fees for the use of public areas. Defendants had a duty to

make such disclosure. Defendants had special knowledge of material facts which the affected residents did not have. Defendants should have said enough to prevent the words communicated from misleading the affected residents.

220.   As a result of Defendants' fraudulent misrepresentations and omissions to the residents, Plaintiffs  suffered damages.

221.   Defendants knew or should have known that their conduct was directed to one or more senior citizens or disabled persons. One or more senior citizens or disabled persons are more vulnerable to Defendants' conduct than other members of the public because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and actually suffered physical, emotional, or economic damage resulting from the defendant's conduct. Defendants' conduct caused senior citizens or disabled persons to suffer damages. In addition to foregoing damages, Defendants are subject to civil penalties for each violation.

WHEREFORE, Plaintiffs, MARK MURPHY AND MARIA MURPHY, as guardians of OLIVIA MURPHY, BERNITA GIGOWSKI as guardian of SARAH MELISSA GIGOWSKI, DEBORAH HOLLAND as guardian of SEAN HOLLAND, LUANNE SELLS, as guardian of TYLER RAYMOND SELLS, and SUZANNE PREVATT TRUEBLOOD, as guardian of AUSTIN JAMES TRUEBLOOD, demand judgment against Defendants, VILLAGES AT NOAH'S LANDING LTD., NOAH'S ARK OF CENTRAL FLORIDA, INC. d/b/a ROAR

FLORIDA, and ROYAL AMERICAN MANAGEMENT, INC., declaring that the actions of the Defendants defrauded the PLAINTIFFS; awarding the PLAINTIFFS injunctive relief to prohibit such deceptive actions in the future; awarding compensatory and punitive damages; and granting such other and further relief as the Court deems just and proper.

## COUNT IX–UNJUST ENRICHMENT
### (CLASS COUNT AGAINST THE VILLAGES AT NOAH'S LANDING LTD.)

222.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 158 above as though fully set forth herein.

223.     Defendant The Villages at Noah's Landing LTD. received approximately fifteen (15) million dollars from FHFC and various lenders to provide services to Plaintiffs and all residents.

224.     Plaintiffs conferred a benefit to Defendant by paying a Lifestyle Enrichment Activity (LEA) fee, which Defendant  charged to permit Plaintiffs to participate in activities and programs promised in the LURA.

225.     Defendant had knowledge of this benefit, as Plaintiffs continuously paid the LEA fees continuously, affecting the Plaintiffs' overall rent burden.

226.     Defendant has accepted and retained the benefit conferred by Plaintiffs.

227.     The circumstances are such that it would be inequitable for  Defendant The Villages at Noah's Landing to retain the benefits previously paid for.

WHEREFORE, Plaintiffs, MARK MURPHY AND MARIA MURPHY, as guardians of OLIVIA MURPHY, BERNITA GIGOWSKI as guardian of SARAH MELISSA GIGOWSKI, DEBORAH HOLLAND as guardian of SEAN HOLLAND, LUANNE SELLS, as guardian of TYLER RAYMOND SELLS, and SUZANNE PREVATT TRUEBLOOD, a guardian of AUSTIN JAMES TRUEBLOOD, individually and on behalf of others similarly situated demand judgment against Defendant, VILLAGES AT NOAH'S LANDING LTD., to disgorge all funds paid by plaintiffs through LEA fees, or received by lenders for the benefit of those residents who did not receive services paid for by the lenders as well as such other and further relief as the Court deems just and proper.

**PLAINTIFFS DEMAND A TRIAL BY JURY FOR ALL ISSUES FOR WHICH A TRIAL BY JURY IS PERMITED.**

**Dated this day of 2nd day of February 2025.**

> */s/* Matthew Dietz
> Professor Matthew W. Dietz
> Florida Bar Number: 0084905
> Disability Inclusion & Advocacy Law Clinic
> Nova Southeastern University
> Shepard Broad College of Law
> 3305 College Avenue
> Fort Lauderdale, FL 33314
> Tel: (954) 262 – 6138
> Email: mdietz@nova.edu
> Attorney for Plaintiffs

*/s/ Jack Scarola*
Jack Scarola
Florida Bar No. 169440
E-Mail(s): jxs@searcylaw.com;
ScarolaTeam@searcylaw.com
*/s/ Victoria Mesa-Estrada*
Victoria Mesa-Estrada
Florida Bar No.: 76569
E-Mail(s): vmestrada@searcylaw.com;
MesaTeam@searcylaw.com
Searcy Denney Scarola Barnhart & Shipley,
P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, FL 33409
Phone:561-686-6300 Work
Fax:561-383-9451
Attorneys for Plaintiffs

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I electronically filed the foregoing document with the Clerk of the Court using CM/ECF on February 2nd, 2025 which will automatically generate and serve Notices of Electronic Filing on all counsel of record.

*/s/ Victoria Mesa-Estrada*